IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **EUGENE HORTON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **01-614-CJP**[1] |
| | ) | |
| **DONALD SNYDER, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**PROUD, Magistrate Judge:**

Plaintiff Eugene Horton, who at all relevant times was incarcerated at Tamms Correctional Center, brought the above-captioned action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights.  (*See also* **Docs. 19 and 53**).  Plaintiff's claims that defendants Donald Snyder, George Welborn and Charles Hinsley intentionally subjected plaintiff to foreseeable physical and mental harm by placing him in a single-man cell, exposing him to second-hand smoke, subjecting him to bed checks at 30 minute intervals, and not allowing him to have contact with other inmates– all in violation of the Eighth Amendment.[2]

---

[1] Pursuant to 28 U.S.C. § 636(c)(1), upon the consent of the parties, U.S. District Judge Michael J. Reagan referred this case to U.S. Magistrate Judge Clifford J. Proud for final resolution.  **(Docs. 300 and 305).**

[2] Plaintiff's amended complaint listed the Illinois Department of Corrections ("IDOC")as a defendant.  **(Doc. 19).**  However, the threshold order issued by U.S. District Judge Michael J. Reagan delineating the claims did not recognize a claim against the IDOC.  **(Doc. 53).**  This Court does recognize a general attack on an assortment of policies, which could be construed as a claim relative to the IDOC.  Nevertheless, the final pretrial order controlling this case **(Doc. 303)** makes no mention whatsoever of a claim against the IDOC; therefore, any and all claims against the IDOC are considered abandoned.  *See Vaughn v. King*, 167 F.3d 347, 352 (7th Cir. 1999) ("Pretrial orders supersede the pleadings."); *see also* **Fed.R.Civ.P. 16(e).**

**(Doc. 303).** A jury trial was commenced November 7, 2005, and at the close of plaintiff's case-in-chief the defendants moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a). **(Doc. 344).** The Court provisionally granted the motion, indicating that a formal written order would follow. Accordingly, the Court finds as follows.

## Summary of Relevant Evidence

At all relevant times defendant Snyder was the director of the Illinois Department of Corrections, defendant Welborn was warden of Tamms Correctional Center, and defendant Hinsley was assistant warden at Tamms. Tamms was and is the highest security prison facility operated by the Illinois Department of Corrections. **(Doc. 303, p. 4).** It is undisputed that Tamms holds inmates who have demonstrated an inability or unwillingness to conform to the requirements of a general prison population prison. **(Doc. 303, p. 4).** According to Warden Welborn, Tamms was designed to house the most violent and disruptive inmates, with the hope that it would help the other institutions to operate better. **(Transcript of Proceedings ("Tr."), Day 2 ("D2"), p. 46).** Plaintiff had an extensive disciplinary history of offenses committed in prison between 1971 and 1997. **(Doc. 303, pp. 4-5).** For reasons no longer at issue in this case, plaintiff was transferred to Tamms on March 17, 1998; he transferred out of Tamms on March 30, 2005. **(Doc. 303, pp. 4-5).**

Tamms has only single-man cells and, due to the very nature of the institution and the inmates it contains, inmates are not permitted to have physical contact with each other. **(Doc. 303, p. 5).** Rather than metal bars or solid steel doors with slats, the cell doors are made of perforated metal, so one can be seen and heard. **(Tr. D2, p. 48).** Plaintiff was housed at all relevant times on the H-1 wing. **(Tr. D2, p. 138).** According to plaintiff, the conditions of his

2

confinement– specifically the constant bed checks and related noise and illumination during the night, and exposure from second-hand smoke from prison staff smoking nearby– deprived him of sleep, caused a sleeping disorder that exists even now that he has left Tamms, caused him stomach upset, chronic pain and weight loss, aggravated his hypertension, and exposed him to possible future medical problems.  **(Tr. D2, pp. 141-142, 144-145; and Tr. Day 3 ("D3"), p 23).**

Plaintiff and fellow inmates James Walker, Ozzie Pickett and Isaiah Green all testified that they could barely get any sleep at night due to bed checks that occurred at 30 minute intervals throughout the night, and often more frequently, combined with 30 minute wing checks.  **(Tr. Day 1 ("D1), pp. 8-11, 32-33; Tr. D2, pp.115, 140-141).**  All four inmates testified that correctional officers would turn on lights during their checks, require inmates to speak or move from under their blankets, and the officers would intentionally make a lot of noise as they walked through the wing, rattling their keys and handcuffs.  The inmates collectively felt that the frequency of the checks was beyond what was required for security, particularly given the fact that the wings are monitored by video cameras and there is an intercom in each cell.  The inmates acknowledge that none of the three defendants personally performed the bed checks or were disruptive.  However, plaintiff complained to defendants Hinsley and Welborn, both verbally and in writing; Walker complained to Hinsley; and Pickett and Green complained to Hinsley and Welborn and filed grievances that were forwarded to Snyder by way of the Administrative Review Board.  **(Tr. D1, pp. 19-20, 25, 35; and Tr. D2, pp. 110, 126 and 153).**  Defendant Hinsley purportedly told plaintiff, "Get over it.  Conditions here at Tamms are harsh."  **(Tr. D3, p. 14).**

3

Plaintiff, Walker, Pickett and Green also all testified that cigarette smoke wafted from the ice room on the wing, which was a designated smoking area for prison personnel. **(Tr. D1, pp. 14-15, 24-25, 39-45; and Tr. D2, pp. 116, 121, 128, 144, 147, 150; and Tr. D3, p. 23).** According to plaintiff and the other three inmate witnesses, smoke escapes out into the housing wing when the door to the ice room is opened and closed, and some staff smoke outside the room, even on the wing, and smoke permeates the food trays kept near the ice room and it travels through the ventilation system from the ice room to the cells. By plaintiff's calculation, he smelled smoke a total of 18 hours out of each day; Walker estimated he smelled smoke for a total of 15 minutes per day; and by Pickett's estimation, he smelled smoke 12 hours out of each day. **(Tr. D1, pp. 17-18 and 45; and Tr. D2, p. 144).** Plaintiff asserts that the second-hand smoke aggravates his hypertension, and he fears that he will "get some kind of disease." **(Tr. D2, p. 144; and Tr. D3, p. 23).** Plaintiff testified that Dr. Powers told him that smoking would aggravate his hypertension, but plaintiff also acknowledges the doctor did not opine about the effects of being exposed to second-hand smoke. **(Tr. D3, p. 42).** Plaintiff stopped smoking in January 1985. **(Tr. D3, pp. 43-44).** Plaintiff repeatedly complained to defendants Hinsley and Welborn, to no avail. **(Tr. D2, p. 153; and Tr. D3, p. 34).**

Defendant Welborn testified that, as warden, he was responsible for the overall operations at Tamms. **(Tr. D2, p. 5).** Welborn explained that there is a state-wide policy that bed checks are supposed to be taken every 30 minutes, on an *irregular* schedule, for obvious security reasons, and to also ensure the safety of the inmates. **(Tr. D2, pp. 31-33).** Guards must also confirm that what appears to be an inmate is actually an inmate, so a guard may want to see skin, or the inmate may be asked to speak or move a body part. **(Tr. D2, pp. 33-34 and 54).**

There is a low voltage light in each cell, and those lights are turned on when the guards make their checks, and then turned off.  **(Tr. D2, pp. 54-55).**

Tamms has a policy that smoking is not allowed in the housing unit wing areas.  **(Tr. D2, p. 7).**  After reports from inmates and staff that the policy was not being followed, Warden Welborn issued a bulletin about the proper smoking areas to all staff in July 1998, which was read at roll call on five consecutive days.  **(Tr. D2, pp. 8-9).**  The ice room is a designated smoking area.  **(Tr. D2, p. 9).**  According to Welborn, the ice room is off the wing, and it has a solid steel door. **(Tr. D2, p. 13).**  Another such memo was issued by Director Snyder's office (signed by a designee) in August 1999.  **(Tr. D2, pp. 17-18; Plaintiff's Exhibit 9a).**  Welborn testified that the facility was intended to be entirely smoke free, but a clause in the employees' union contract requires smoking areas.  **(Tr. D2, pp. 27 and 29-30).**  Although the door to the ice room is not required to be closed at all times, the contractor informed Welborn that smoke from the ice room would not recirculate to the cells, and the Department's environmental coordinator's tests confirmed that the smoke was not recirculating into the cells.  **(Tr. D2, pp. 15, 28 and 51).**

Defendant Hinsley testified that, as assistant warden in charge of operations, security and living conditions were within his purview.  **(Tr. D2, pp. 64-65).**  Hinsley corroborated Warden Welborn's testimony regarding the bed check procedures and the necessity that guards hear a voice or see body movement to confirm an inmate's presence in the cell, to ensure inmate safety and security.  **(Tr. D2, pp. 73 and 82).**  The bed check itself, as well as noise from keys, walkie talkies and merely walking up and down the wing creates some noise, but prisons are generally noisy and inmates do not all sleep on the same schedule.  **(Tr. D2, pp. 72 and 82-83).**  Hinsley

further explained that the video cameras set up to monitor the outside of the cells does not permit guards to monitor inside each cell, thus the need for bed checks.  **(Tr. D2, pp. 79-80).**

With respect to the smoking situation, defendant Hinsley indicated that he did not take any action in response to complaints from inmates because Warden Welborn had taken action. **(Tr. D2, p. 69).**  However, Hinsley testified that he did ensure the warden's directive was followed, although he never encountered smoke on the wings.  **(Tr. D2, pp. 70-71 and 76).** According to Hinsley, inmates cannot see the smoking room from the wing.  **(Tr. D2, p. 77).** Hinsley stated that the door to the ice room is closed, but it must be opened and closed for entrance and egress.  **(Tr. D2, p. 86).**

Defendant Snyder, former director of the Illinois Department of Corrections, was not present at trial.

## Relevant Legal Principles

The conditions of an inmate's confinement may constitute cruel and unusual punishment in violation of the Eighth Amendment, which applies to the States through the Fourteenth Amendment.  ***See Wilson v. Seiter*, 501 U.S. 294 (1991).**  In order to establish that a condition of confinement violates the Eighth Amendment, a two part test must be satisfied.  First, an objective determination must be made that the conditions the inmate was required to endure exceeded contemporary bounds of decency; second, a subjective determination must be made that the officials acted with a sufficiently culpable state of mind.  ***See Wilson*, 501 U.S. at 298;** *see also Lunsford v. Bennett***, 17 F.3d 1574, 1579 (7th Cir. 1994).**  Put another way, an inmate must be deprived of the "minimal civilized measure of life's necessities" **(*Rhodes v. Chapman*, 452 U.S. 337, 347 (1981))**, and the prison officials must have acted "wantonly," meaning that they acted with a deliberate indifference **(*Lunsford*, 17 F.3d at 1579)**.

6

Thus, as *Rhodes* explains, it is those prison conditions which involve wanton and unnecessary infliction of pain, totally without penological justification, which offend the Constitution. **See Rhodes, 452 U.S. at 346.** This is a difficult standard to reach; prison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment. **Farmer v. Brennan, 511 U.S. 825, 833-34 (1994); Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir. 1997).** Furthermore, mere negligence does not satisfy the deliberate indifference standard. Rather, plaintiffs must demonstrate "something approaching a total unconcern for [his] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." **Duane v. Lane, 959 F.2d 673, 677 (7th Cir.1992).** However, requests for relief which have fallen on deaf ears *may* evidence deliberate indifference. **Dixon, 114 F.3d at 645.**

The Eighth Amendment is violated when an official exhibits "deliberate indifference"-- when an official "knows of and disregards an excessive risk to inmate health or safety[;] the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." **Farmer, 511 U.S. at 837.** This standard is subjective, and is the equivalent of recklessness in the criminal law sense. **Id.**

Personal involvement is a prerequisite for individual liability in a civil rights action such as this; a defendant must have caused or participated in an alleged constitutional deprivation to incur liability. **Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir.1983); 42 U.S.C. § 1983.** The doctrine of *respondeat superior* cannot be used to impose Section 1983 liability on a supervisor for the conduct of a subordinate violating a plaintiff's constitutional rights. **Lanigan v. Village of East Hazel Crest, Ill., 110 F.3d 467, 477 (7th Cir. 1997).** However, supervisory liability will be found if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. **Lanigan, 110 F.3d at 477.** Supervisors who are simply negligent in failing to detect and prevent subordinate misconduct are not "personally involved" so as to incur liability. **Id.** "Rather, 'supervisors must know about the conduct and facilitate it,

approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.'" *Id.* **(quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-993 (7th Cir. 1988));** *see also Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997).

## Analysis

Defendants Snyder, Welborn and Hinsley moved for judgment as a matter of law at the close of plaintiff's case-in-chief. **(Tr. D3, pp. 59-61).** Defendants contend that they are entitled to qualified immunity on all claims. In addition, with respect to the bed check policy, they assert that the policy is related to security and safety concerns, plaintiff has not demonstrated any harm, and there is insufficient evidence of any malicious intent. It is also argued that there has been no evidence of personal involvement by Director Snyder. Furthermore, from defendants' perspective, plaintiff failed to present evidence that the defendants intentionally subjected plaintiff to serious harm, in that plaintiff presented no medical evidence in support of the alleged harms, let alone cause and effect. The defendants also assert that their personal involvement was not established, except for evidence that defendant Welborn actually took corrective action when the smoking policy was not adhered to.

Plaintiff generally countered that it is commonly known that sleep is one of life's necessities and that hypertension is a serious medical impairment, and the defendants, despite personal knowledge, allowed conditions to continue that subjected him to cruel and unusual conditions of confinement. **(Tr. D3, pp. 62-72).**

Plaintiff came to trial alleging defendants Snyder, Welborn and Hinsley intentionally subjected him to foreseeable physical and mental harm by placing him in a single-man cell, exposing him to second-hand smoke, subjecting him to bed checks at 30 minute intervals, and not allowing him to have contact with other inmates– all in violation of the Eighth Amendment. **(Doc. 303).** However, plaintiff effectively abandoned his claims regarding being placed in a single-man cell, and not having contact with other inmates. The *only* evidence presented on

8

those issues merely confirmed that plaintiff was in a single-man cell, like all other inmates, and that the inmates could speak to one another on the wing. Plaintiff has failed to present evidence that being celled alone and only being able to speak with other inmates caused him any harm, and there is no basis from which any reasonable person could conclude that these two conditions of his confinement exceeded contemporary bounds of decency. Moreover, plaintiff presented no evidence linking the three defendants to his cell assignment or the prohibition against inmates having physical contact. If anything, plaintiff's stipulation that Tamms houses inmates who have demonstrated an inability or unwillingness to conform to the requirements of a general prison population provides a penological justification for those conditions.

Insofar as the defendants assert that they are entitled to qualified immunity on the two remaining claims regarding the bed checks and exposure to second-hand smoke, the Court cannot immediately dispose of those claims merely because it is not clearly established that those conditions violate the constitution. Those two claims conceivably fall within the ambit of the general Eighth Amendment principles set forth above. Nevertheless, plaintiff has failed make out a legally viable claim, even when all of the evidence is viewed in the light most favorable to his case.

With respect to the second-hand smoke claim, plaintiff has not presented any evidence linking a rise in his blood pressure to exposure to second-hand smoke. At best, plaintiff presented hearsay evidence that Dr. Powers told him that *smoking* would aggravate his hypertension; nothing was said about exposure to *second-hand smoke*. Although public sentiment is growing against smoking and exposure to second-hand smoke, there is no medical or public consensus on the issue that would permit the Court to accept the proposition without the formal presentation of medical/scientific evidence. Similarly, plaintiff has presented no medical or scientific evidence that interrupted sleep and exposure to the noise associated with routine bed checks and wing checks throughout the night causes a serious risk to health or safety. And, again, there is no evidence of cause and effect linking these conditions to a rise in

plaintiff's hypertension, let alone evidence that plaintiff's hypertension rose to a level that was a serious health risk that could not be treated with medication, or that would preclude him from being housed at Tamms. There is also no medical or scientific evidence that plaintiff has a serious sleeping disorder.

From plaintiff's perspective, the defendants have taken their security concerns too far. However, plaintiff stipulated that Tamms is the State's highest security level facility, housing those with a demonstrated inability or unwillingness to conform to the requirements of a general prison population. It is axiomatic that frequent, irregularly timed security checks are necessary, and that guards confirm that each inmates is in his cell. Such checks also ensure inmates are alive and not in need of medical care. The video cameras on the wing do not allow the inside of each cell to be monitored, and the intercom system is of little use in foiling an escape attempt; therefore there is a legitimate penological need to hear a voice, or see body movement. These checks cannot be performed without footsteps, keys and walkie talkies, and there is no evidence that this ambient noise was at an unhealthy level.

**IT IS THEREFORE ORDERED** that defendants Snyder, Welborn and Hinsley's joint Rule 50 motion for judgment as a matter of law **(Doc. 344)** is **GRANTED**. Plaintiff has failed to present any legally viable Eighth Amendment claims.

**IT IS FURTHER ORDERED** that, for reasons summarized in footnote 2, the Illinois Department of Corrections, named as a defendant in the amended complaint, is dismissed, as plaintiff has abandoned any and all possible claims against the Department.

**IT IS FURTHER ORDERED** that final judgment shall enter accordingly, in favor of defendants Snyder, Welborn, Hinsley and the Illinois Department of Corrections and against plaintiff Horton. Plaintiff shall take nothing from this case.

**IT IS SO ORDERED.**

**DATED: March 20, 2006**              <u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**